James W. MULVANEY, Plaintiff,

v.

John C. STETSON, Secretary of the Air Force, et al., Defendant.

No. 78 C 3019.

United States District Court, N. D. Illinois, E. D.

July 10, 1980.

---

James W. Mulvaney, pro se.

Thomas P. Sullivan, U.S. Atty. and Mary Rigdon, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM DECISION

MARSHALL, District Judge.

In this *pro se* case, plaintiff seeks a change in his 1945 discharge from the Army from general to honorable. In our memorandum decision of May 29, 1979, 470 F.Supp. 725 (D.C.Ill.), we held that plaintiff's action was not barred by the six-year statute of limitations contained in 28 U.S.C. § 2401. Because the Air Force Board for the Correction of Military Records (Correction Board) in 1976 had considered plaintiff's plea for a change in his discharge, we held that the instant action, essentially a request for review of the Correction Board's action, did not accrue until the date of the Correction Board's decision. Thus we concluded that we have mandamus jurisdiction under 28 U.S.C. § 1361 to review the Correction Board's action. Defendant's motion for summary judgment with respect to this review is now pending.

Plaintiff enlisted in the Army in October, 1942. In July, 1945, while serving as a private in the Army Air Corps at Lincoln Army Air Field, in Lincoln Nebraska, he was given an undesirable discharge. A Board of Officers determined after a hearing that plaintiff possessed "habits and traits of character which render his retention in service undesirable." *See* Army Regulation 615–368. Plaintiff alleges that the evidence presented at the hearing was false and that the hearing was designed to "railroad" him out of the service.

During the time immediately preceding his discharge, plaintiff, a 21 year old private, was having an affair with the wife of a colonel who was overseas. Upon learning of this sexual insubordination, one of the colonel's colleagues, Major Lindstrum, became determined to remove plaintiff from the Army. Plaintiff alleges that Lindstrum

gave plaintiff the choice of accepting an undesirable Section Eight discharge or being court martialled for unspecified crimes and serving time in a federal prison. If this was the Hobson's choice given plaintiff, it is understandable that he chose the former and cooperated with Lindstrum in fabricating evidence which convinced the Board of Officers that plaintiff was psychologically unfit for duty.

After his discharge, plaintiff made numerous attempts in 1946, 1948 and 1950 to obtain a change in his discharge. He was unsuccessful until 1976, when he finally persuaded the Correction Board that he deserved some relief. The Correction Board granted partial relief by changing plaintiff's discharge from undesirable to general. The Board, however, refused to grant plaintiff an honorable discharge. This suit followed.

We ruled in our memorandum decision that we have jurisdiction to review the Correction Board's action in denying plaintiff's request for corrective relief. This jurisdiction conferred upon us by the mandamus statute, 28 U.S.C. § 1361, extends only to a consideration of whether the Correction Board acted arbitrarily or capriciously. *Haines v. United States*, 453 F.2d 233 (3d Cir. 1971). Moreover, we are limited in our consideration of the merits of plaintiff's claim by the record before the Correction Board. *Ragoni v. United States*, 424 F.2d 261 (3rd Cir. 1970).

Two sets of plaintiff's records have been submitted here. The first is the administrative record (BCMR) considered by the Correction Board as the basis for its decision. The second is the complete set of plaintiff's military records, referred to as the Master Personnel Records (MPR). These records, which duplicate to a certain extent the administrative record, were badly damaged in a 1973 fire at the National Personnel Records Center in St. Louis, Missouri. As a result, many of these documents are difficult or impossible to read. Nevertheless, a good portion of the docu-

ments are intact or substantially intact. The government's brief indicates that these records were "not available at the time this law suit was filed," and have only recently been located at the National Archives and Record Service. Consequently, plaintiff and the Correction Board, which acted in 1976, did not have access to the MPR. The regulations enacted pursuant to § 1552 indicate that "the applicant shall have access to such official records as are deemed necessary to adequately present his case." 32 C.F.R. § 865.9(e). Plaintiff did not have access to the MPR documents, and many of them are highly relevant to his request for corrective relief. The government argues that its initial view of the facts, based on the administrative record, was substantially complete. If, however, the MPR contain documents which were not available to the Correction Board which tend to support plaintiff's version of the facts, then we should remand the case for a further hearing before the Correction Board.

Before we can decide this issue, a more complete recitation of the facts is necessary. Plaintiff's affair with the colonel's wife reached crescendo when on April 17, 1945, she met him at the guardhouse where he was on duty as a military policeman. Plaintiff's wife arrived on the scene and interrupted the tryst. An altercation ensued. This incident, according to plaintiff, provoked Major Lindstrum to begin his efforts to remove plaintiff from the military culminating a mere twenty days later, on May 7, 1945, in a hearing which was held to determine plaintiff's fitness for service.

The following evidence was introduced at the hearing. Lieutenant Colonel Balser, Chief of the Section of Neuropsychiatry, recounted evidence demonstrating plaintiff's inability to control his temper. This evidence was supplied to Balser by plaintiff and was verified by plaintiff's sister in an interview with a member of the Red Cross. On the basis of this information Balser gave the following diagnosis: "constitutional psychopathic state, emotional instability

and criminalism" with no chance of rehabilitation. BCMR 113. Major Lindstrum and a Private Bunce, a military policeman, testified that plaintiff had a volatile temper. Lindstrum cited two examples of this temper. BCMR 115. First, plaintiff allegedly fired his weapon at another military policeman while on duty. Private Winkle, the target of the alleged shot, corroborated Lindstrum's testimony, by stating that plaintiff had fired his pistol at Winkle in anger. BCMR 112. Private Bunce also provided some support for the shooting incident, testifying that he saw plaintiff fire his weapon for no reason. BCMR 111. The second incident cited by Lindstrum was the incident at the guardhouse when plaintiff's wife discovered plaintiff and the colonel's wife. According to the testimony at the hearing, the colonel's wife departed upon the arrival of plaintiff's wife, and plaintiff and his wife argued in plaintiff's car, during which plaintiff allegedly struck his wife on the head with his pistol. BCMR 115. Finally there was a statement written by plaintiff in which he said that he had a violent temper, that he did not "get along with people very well," and that he could not guarantee that he could "alter my personality." BCMR 117–18.

Plaintiff now contends that virtually all of this evidence was fabricated at Major Lindstrum's insistence. We must divide this contention into two factual issues: first, whether the evidence of plaintiff's psychological condition was false and second, whether Lindstrum coerced plaintiff into fabricating the evidence. We will consider first the documentary evidence with respect to these two issues contained in the administrative record. We will then consider whether the MPR, which was not available to plaintiff or the Correction Board, provide any additional support for plaintiff's argument.

In 1974, certain of those who had contributed evidence at plaintiff's discharge hearing signed notarized statements retracting or explaining the statements given at the hearing. Mr. Winkle stated that he and plaintiff concocted the shooting incident after plaintiff sought help from Winkle in gathering evidence that would enable plaintiff to avoid prosecution by obtaining a Section Eight discharge. BCMR 107. In 1974, Bunce retracted his earlier testimony regarding plaintiff's bad temper. BCMR 106. Plaintiff's sister also stated that she, too, had "related what my brother advised me to," and that in fact, plaintiff "as a youth, was no better or no worse than any other boy." BCMR 114.

Plaintiff also contends that he was not present at the discharge hearing (indeed, he says he was not allowed to attend) and was given a statement purportedly summarizing his testimony and instructed to sign it without reading it. The statement indicates that plaintiff heard the testimony of various witnesses, but Bunce's 1974 affidavit states that during his testimony, plaintiff was not present.

As further support of his contention that he was not psychologically unfit for service, plaintiff points to the administrative record which contains plaintiff's service record indicating that in the ten different Army units with which plaintiff served, he received character ratings ranging from satisfactory (1) to excellent (4). BCMR 87. At no time prior to his discharge hearing was plaintiff's character found lacking. Additionally, we note that the administrative record contains documents relating to plaintiff's employment subsequent to his discharge. The most important of these indicates that in plaintiff's current job as a social worker for the Illinois Department of Public Aid, which he has held since 1968, plaintiff has steadily improved his performance ratings. By 1972, plaintiff received superior ratings, the highest possible rating, in most categories. BCMR 38.[1] This docu-

---

1. This material is buttressed by affidavits from plaintiff's father, his priest, and a fellow worker attesting to plaintiff's good character. BCMR 121–123.

mentation at least tends to contradict Dr. Balser's conclusion that plaintiff had an uncontrollable temper and was beyond rehabilitation.

As evidence in support of the contention that the fabrication of the evidence was prompted by Lindstrum, the record contains a 1974 affidavit signed by Gladys Bunce, wife of the soldier who testified as to plaintiff's temper. Mrs. Bunce stated that her husband told her of Lindstrum's "wrath about Jim being involved with a colonel's wife." She avers that Lindstrum "intimidated" her husband to provide details of the relationship between plaintiff and the colonel's wife. Moreover, when Lindstrum asked Bunce to sign an "unreasonable" statement about plaintiff and Bunce refused, Lindstrum placed so much pressure on Bunce that his and Mrs. Bunce's "domestic tranquility" was affected. Therefore Bunce signed the statement "for the Major" solely to avoid his wrath. BCMR 107.

Mr. Winkle's affidavit indicates that he was aware of Lindstrum's animosity toward plaintiff and that Lindstrum was "out to 'get'" plaintiff. BCMR 107. Mr. Bunce's 1974 affidavit also indicates that "it was more or less common knowledge that Major Lindstrum was out to get" plaintiff. BCMR 105. Plaintiff's sister stated in 1974 that plaintiff explained Lindstrum's threat to her in asking for her assistance in providing adverse information as to his behavior as a child.

The Correction Board's view of the foregoing evidence is unclear. First the Board found that "an injustice had been done in this case." BCMR 55. It then adopted, as its findings of fact, the report regarding plaintiff's request for corrective relief prepared by the Air Staff. BCMR 58. This report summarizes the testimony adduced at the discharge hearing and concludes that an undesirable discharge "does appear harsh by today's standards" and that if the case were processed today, plaintiff would have been discharged for unsuitability with

a general discharge. The report concludes, however, that plaintiff's "record was not so meritorious as to warrant an honorable discharge." Thus the Board apparently based its decision on the harshness of the discharge under current standards and not on the basis that evidence had been fabricated at the insistence of plaintiff's commanding officer.

In light of the evidence contained in the administrative record alone, we might have been inclined, were we the arbiter of first impression, to rule in favor of plaintiff and to grant an honorable discharge. The record indicates that the evidence submitted at the discharge hearing was fabricated, and that plaintiff was not psychologically impaired. Absent the testimony of Winkle and Bunce, the corroboration provided to Balser's testimony by plaintiff's sister, and plaintiff's statement, which he now recants, the Officer Board would have had no pattern of antisocial behavior. Lindstrum's statement would have stood alone, and Balser's diagnosis would have been suspect. The only occurrence not adequately explained by the administrative record was the incident at the guardhouse. Although plaintiff states that he never hit his wife with his pistol, the details of the occurrence, on the administrative record, remain murky.

As for the evidence that Lindstrum was the moving force behind the fabrication of evidence, the 1974 affidavits prepared by the Bunces indicate Lindstrum's participation in the scheme and his desire that it should succeed. Moreover, although plaintiff's sister's affidavit is not persuasive evidence that plaintiff was coerced, since plaintiff's statement to his sister was self-serving, it does show that the plaintiff did not conjure up the vendetta against him by Lindstrum after his discharge.

However, we would be hard pressed to conclude, on the basis of the administrative record alone, that the Correction Board acted arbitrarily. The evidence regarding Lindstrum's role in the affair might not

have been strong enough to warrant a finding that he had coerced plaintiff into taking a trumped up Section Eight discharge in lieu of a court martial and a potential penitentiary sentence. Furthermore, although we would not have so found, the Board might not have acted capriciously in discounting the new evidence regarding plaintiff's psychological condition, inasmuch as some of the evidence consists of self-serving statements by plaintiff. But given the new evidence contained in plaintiff's MPR pertaining to both issues, we cannot characterize as noncapricious or nonarbitrary any Correction Board action unfavorable to plaintiff.

On the issue of whether the discharge hearing evidence was fabricated, the MPR contain what remains of plaintiff's medical records. These records indicate that plaintiff had a recurring problem with headaches. *See* MPR 205, 216, 228, 229, 365, 366. Although one document indicates that the headaches may have been triggered by anger, MPR 365, the fairly extensive medical records contain no evidence of antisocial behavior and uncontrollable temper prior to the event surrounding plaintiff's discharge.

Further, the MPR contain statements or affidavits of several officers and fellow soldiers of plaintiff who testified that plaintiff had been a capable and efficient soldier who had never exhibited an uncontrollable temper. *See* MPR 351 (Sgt. Foley), MPR 495 (Hurlburt Affidavit), MPR 280, 347, 395, 496 (Col. Medbury). Colonel Medbury, one of plaintiff's commanding officers, stated that he felt secure in giving plaintiff responsibility and that plaintiff was "more reliable than the average soldier." Medbury never saw evidence of any character trait rendering plaintiff unfit for military service. MPR 280. *See also,* MPR 281, 348 (Winkle Affidavit).[2]

One of the most significant documents in the MPR is an affidavit from plaintiff's former wife, discussing her encounter with the colonel's wife and plaintiff at the guardhouse. Plaintiff's former wife stated that plaintiff used no force in persuading her to enter the car. Plaintiff was not violent; he tried to comfort and to quiet her. He did not touch her while they were in the car. She felt something moist on her head, put her hand on her head and discovered her head was bleeding. She screamed because she saw blood, not because she was in pain. Although she saw plaintiff fumbling with his holster, she never saw him remove the gun from the holster, nor did she feel a blow to her head. The bleeding was caused by a "superficial scratch." MPR 579, 625. In light of this affidavit, we conclude that the incident which triggered the discharge hearing did not occur as the Board of Officers was told that it did.

As for the evidence of Lindstrum's participation in the scheme, the record contains an affidavit from a soldier who overheard Lindstrum tell plaintiff, "If you don't take the Section Eight discharge I am putting through on you, I will see to it that you get ten years in Leavenworth and a D.D. [dishonorable discharge]." MPR 581 (Porter Affidavit). Moreover, the record contains statements about Major Lindstrum indicating that he was capable of such a statement. Colonel Medbury stated that he and other officers considered Major Lindstrum to be

> [S]omewhat lacking in discretion in exercising his authority particularly with reference to his tendency to apply or recommend and urge application of the most stringent disciplinary measures possible to EM [enlisted men] who were guilty of more or less minor infractions.

MPR 280. *See also* MPR 349, 499 (Simburg Affidavit); MPR 374–76 (Johnson letter). Plaintiff's former wife stated that "about a month" after the incident Lindstrum told her that plaintiff was going to "get it." Plaintiff's wife stated that he made the statement in a "nasty, vituperative manner." MPR 580. Another affidavit, signed

---

2. A letter from a former Judge Advocate who investigated plaintiff's story indicates that Mr. Bunce, one of those testifying against plaintiff at the hearing who later recanted his story, felt some animosity toward plaintiff even at the time he recanted his earlier statement about plaintiff. Thus Bunce had no incentive to lie to help plaintiff.

by Lt. Perryman, who sat on the Officer Board which discharged plaintiff, indicates that Dr. Balser was also somewhat overzealous in finding soldiers unfit for duty for psychological reasons. MPR 304, 582.

The only issue adverse to plaintiff in the MPR is a statement from a doctor who examined plaintiff upon his entrance into the hospital on April 19, 1945, two days after the guardhouse incident. Although plaintiff states that he entered the hospital for migraine headaches, he apparently told the admitting doctor a version of the guardhouse incident which he now says was false.[3] MPR 203–06. The Army argues that this indicates that plaintiff fabricated the evidence before he saw Dr. Balser, and that therefore he was acting on his own.

The discharge hearing was held only twenty days after the guardhouse incident. Events were moving rapidly. It is conceivable that Lindstrum placed immediate pressure on plaintiff to fabricate adverse information. In light of the other evidence in the record which tends to prove plaintiff's version, this single piece of information is not particularly significant; certainly it is not controlling.

■ This brief review indicates that there is substantial additional evidence contained in the MPR which was not available to plaintiff or the Correction Board. Therefore, we have concluded that the case should be remanded to the Board for an additional hearing at which this evidence can be submitted to and considered by the Board. This is particularly appropriate in a case such as this where the Board had no control over the unavailability of the documents. The Board, like all judicial and quasi-judicial agencies, sits first to do justice. We are confident that the Board will reach a different result after reviewing the totality of the present record.[4]

■ The only issue remaining for our consideration is the government's argument that plaintiff has unclean hands and that he is estopped to deny the truth of the evidence adduced at the hearing. Plaintiff, at the time of his discharge, was a 21-year old private with less than two years of high school. He alleges that he was forced by a superior commanding officer to choose between a prison sentence and an undesirable discharge. If this allegation is true, we will not condone the behavior by denying plaintiff relief on the grounds that he should have resisted what must have been irresistible pressure. This is not a case in which a serviceman concocted a calculated scheme to obtain his discharge. *See Weir v. United States*, 474 F.2d 617, 200 Ct.Cl. 501 (1973). Rather, this is a case in which an immature serviceman bowed to coercion exercised by a determined superior.

■ Moreover, the government cannot now justify the Army's action on the ground that it could have court martialled plaintiff for assaulting his wife and for leaving his post. Even if plaintiff had committed these offenses, Lindstrum was not justified in forcing plaintiff and others to create evidence designed to prove plaintiff to be eligible for an undesirable discharge. If indeed the evidence was fabricated, Lindstrum cannot be said to have made a permissible and legitimate choice between seeking court martial proceedings and seeking a discharge on the basis of created evidence.

■ Furthermore, the offenses alleged to have been committed by plaintiff should not affect plaintiff's right to an honorable discharge. The administrative record does not persuasively demonstrate that those offenses were committed. Further, plaintiff was never charged with any punishable offense, and the Army now has no jurisdiction over him. The Army cannot now contend

---

**3.** The statement is typed, and a handwritten sentence regarding the incident in which plaintiff allegedly shot at Winkle is included. There is no indication when this was added or why it was not included in the original report.

**4.** As we indicated earlier, it is unclear whether the Correction Board gave any credence to the plaintiff's allegations regarding the scheme Lindstrum coerced plaintiff into accepting. In light of our review of the present record, such a position by the Board upon rehearing would clearly be untenable.

that a discharge based on improper grounds should not be corrected because it could have been based on proper grounds.[5]

Defendant's motion for summary judgment is denied. On the court's own motion, the order of the Air Force Board for the Correction of Military Records is vacated and the cause is remanded to the Air Force Board for the Correction of Military Records for proceedings not inconsistent with this opinion.

---

5. We also note that there has been no suggestion that the two times that plaintiff was AWOL, *see* BCMR 58, would have justified a general rather than an honorable discharge. *See* Plaintiff's Exhibit 11179–1.